We'll call our second case this morning. Number 13-1901, United States v. Calhoun, Mr. Zosmer and Ms. Brotman. Take your time setting up. Mr. Zosmer and Ms. Brotman Mr. Zosmer and Ms. Brotman Mr. Zosmer and Ms. Brotman Mr. Zosmer and Ms. Brotman Whenever you're ready, Mr. Zosmer. Mr. Zosmer and Ms. Brotman Mr. Zosmer and Ms. Brotman Mr. Zosmer and Ms. Brotman Mr. Zosmer and Ms. Brotman Mr. Zosmer and Ms. Brotman    Mr. Zosmer and Ms. Brotman on her denial of several issues, and she said she would leave that open, so we would go back for that. What do we do with Dick v. Missouri? Well, Dick v. Missouri lays out the standard, which is that shackling a defendant in front of the jury is prejudicial, and that prejudice, if this were here on direct appeal, prejudice would be presumed, and there would not be an error if the government could establish beyond a reasonable doubt that it did not contribute to the verdict. That's very important here in emphasizing that this is not a structural error. Having somebody shackled in front of the jury does not automatically result in reversal, and we rely on Dick to establish that, as many courts have subsequently held. It's really important here because it looks like what the district court did in this case is essentially find structural error. The court said, I realize the government had all this evidence, but doesn't address it, just like the defense does not address it in their brief, but said this is just too prejudicial to have somebody seen in shackles. That is contrary to Dick. Does it make a difference at all at what stage in the trial the shackling occurs? Yes, I think in the appropriate case we may argue that if shackling occurs in an inadvertent way or very early in the trial as here, that perhaps the Dick presumption does not apply. We don't think we need to reach that here. The Fifth Circuit has. The Fifth Circuit has said very clearly that it does not apply the presumption when it does happen at an early stage. The more common thing that we see happening in cases when we canvass the field is the inadvertent observation. A juror is standing in a hallway, for example, and sees somebody in handcuffs. It very well may be before this court one day to address whether this presumption really should apply. But it just doesn't matter here because it's so clearly overcome by the evidence. Do we have to address the U.S. Marshals regulations and operations? Well, I don't think so. That issue has not been presented. I think that a judge in an individual case will do that. And that takes me to the first prong here, which is that we are not by any means conceding that Mr. Cannon was ineffective. A lawyer does not have to raise every issue that might occur to somebody. He can pick and choose which issues to present. He thought there was zero chance that Judge Katz would override the Marshals. We hear from the Marshal that in 26 years this has never happened, and probably has never happened ever, that a district judge has told the Marshals to take somebody who is detained, not in shackles, to an assembly room that has 200 people in it and that has multiple exits. But here the shackling is before people who ultimately will be the jurors. Well, that's true. And that's why the defendant faces that choice, which is can he go to this process, which this court has described, albeit in a not presidential opinion, as inconsequential, does he go to that process or does he refrain given the fact that he will be in shackles? Mr. Calhoun made a bad decision. He made a bad decision over the advice of his counsel. And it's somewhat remarkable that then eight years later he gets a new trial on the basis of the decision that he made that, as we also know, did not cause him any prejudice. It's important to emphasize here, Your Honors, as I know you're well aware, the defendant has the burden of proof in this proceeding with regard to both prongs, both ineffectiveness and prejudice. They have not carried their burden. They did not present any evidence that any judge has ever done what they suggest should have been done. We have the Marshal's testimony that it's never happened, and he gave very good, logical, cogent reasons that it's never happened. We have no record here that anybody disagrees with Mr. Cannon that this is not something that a district judge in this building will do, given the nature of the security concerns and given the structure of the building. So they have not carried their burden on the first prong to show that Mr. Cannon acted outside the wide bounds of professional conduct, nor have they carried their burden on the second prong, which they really don't even address. The only comment they would make on the first prong is that he wouldn't be shackled. He would be people, you know, marshals would be nearby. He could be in another room and observe. I mean, there are things that possibly could be done. Well, you're not putting him in front of the putative jurors in shackles. Well, it's interesting. The district court suggested four different options on what could happen, and we break down in our brief why they don't really match with the facts, and the defense in their brief didn't defend any of those four options. Your Honor has now suggested a couple more. I can respond to those also, but the important point is these are suggestions. These are possibilities. They don't carry the burden of showing that Judge Katz would have taken any of these options, and whereas Mr. Cannon testified based on his experience, he doesn't think Judge Katz would have done anything differently. That's the burden they have. As far as Your Honor's suggestions. Well, that would have been so much easier for Mr. Cannon had he just tested the waters. Well, that may be, but we know from the Supreme Court that a lawyer does not always have to test the waters. A lawyer can decide not to raise something he thinks is a dead loser to maintain his credibility with the court and to make sure that he's only presenting meritorious or possibly meritorious arguments to the court. With regard to Your Honor's suggestion, there is no separate room, just physically, as we know from the record. This is one single large room. There's not another place anybody could stand and observe what the lawyers go down to observe, which is simply the reaction of the jurors as their numbers are called, and they're told to line up. So, Mr. Calhoun, somebody comes to you and says, hey, what do we do? I haven't seen this in two and a half decades. He is demanding that he goes into the jury veneer, and he be with his attorney at that time. He's in shackles. What would you suggest? You know, I don't know. It's interesting, Your Honor. I talked about this with my colleagues this morning. I think it's really an administrative question. We didn't come up with a good proposal given the nature of this courthouse. Maybe they could build a wall with a one-way mirror like in the movies with the interrogation rooms where the person could look. That doesn't exist right now in this courthouse. Maybe that would be a solution. We thought of bringing in people in advance and having them sit there when the 200 people arrive. That doesn't work because you'd have to sit there for an hour as people come in, and while the shackles are shielded by some curtain or something, apron on the table, it's a hard problem. It's not that hard a problem because, as we know from Hicks, this is not a significant moment. Lawyers being lawyers go and observe. Lawyers will go watch anything they can watch and gather whatever tidbits of information they can. But it's really not a significant part of the process, and that's what Mr. Cannon did right was he told his client that. He told them, you don't need to be there. You're going to go in shackles if you go. Don't do it. And Mr. Calhoun decided to do it. That was the mistake that he made. So that's why it's not ineffective. He gave him the correct advice. It's not outside the bounds of professional conduct not to make a request that you're sure the judge will deny based on valid security concerns that were completely uncontradicted at the evidentiary hearing that was held. That's the first prong. And then, of course, we have the second prong. Did it cause any prejudice? He really has to jump two hurdles here. He has to show that Judge Katz would have done something differently, and that's where these hypotheticals fail. We can sit here all day and I can talk about curtains and aprons and all these other things, but under the Supreme Court precedent, they have to show a substantial likelihood of a different result, not just a conceivable possibility, not just maybe we could have had a one-way mirror, which we know didn't exist. And there is no showing of that substantial likelihood. And then we get to the ultimate question, which this Court says has to be addressed, and the Supreme Court says you have to look at the body of evidence. You have to look at the trial evidence. This is a trial error, and if it hadn't happened, is there any reasonable probability of a different result? That's probably a good segue to you circle back to where you started on the second prong, and we'll get Ms. Brotman up and then give you additional time. Exactly. I think the Court understands my argument. Thank you very much. Thank you very much. Good morning, Your Honor. My name is Ellen Brotman, and I have the honor of representing David Calhoun today. I would like to start on prejudice also because I'm surprised to hear that the government says this is the strongest case of prejudice it's ever heard. There are two counts in this trial. One is conspiracy with a five-kilogram weight. That's an element of the count. The other is possession. The possession count only related to possession of about a kilogram. And those are very distinct counts with very distinct proof and very distinct consequences. The possession count has a five-year mandatory minimum. The conspiracy count has a 10-year mandatory minimum. I mean, the government, where they started by saying is there was a lot of damning evidence that was introduced at trial. There were months of wiretaps, reported confession to the police, the implication of co-conspirators, the fact that he was found with a kilogram of cocaine when he was arrested, the fact that additional cocaine and $203,000 in cash was found in his residence, testimony of DEA agents who surveilled his residence, and Estevez's testimony corroborating what I just noted. Actually, Your Honor, there is, I'm not sure that there is, I don't believe there is months of wiretaps of Mr. Calhoun. What there is, is there is evidence that as the government's There were months of wiretaps with regard to a putative conspiracy, right? With regard to a putative conspiracy, yes. But the evidence about Mr. Calhoun was that he was a customer of the conspiracy. And that is what the government said in their closing argument. They said there is strong evidence of him being a consistent customer. And absolutely the evidence was, as this Court found on direct appeal, sufficient to sustain a conviction when the evidence is looked at in the light most generous to the government. But when you're talking about, and that's the same on the Rule 29, that evidence that you're a customer and you've made more than one transaction, let's say, and you've been on the phone, that will get you past Rule 29 and that will maintain your conviction at trial. If you were in Mr. Cannon's shoes, what would you have suggested, what would you have done? And you've got a client here who's demanding to go to the jury veneer room. And I want to, yes, well let me answer that. First of all, the jury selection process in federal court, as we know, leaves the lawyer and the client with very little information about the jurors. And so every bit of information that you can get, I would never pass up the chance to go to the veneer room and watch the jurors be selected and see their reaction to that selection. So that's number one. I don't think it's as inconsequential. Well, that's for Mr. Cannon. It's a good thing, obviously, to do that. But the other point is, had Mr. Cannon made that motion, the judge would have been required to do an individualized inquiry on the necessity of shackling. And visible shackling would have been the last resort rather than the first resort. A reasonable alternative to visible shackling would have been sought and it could have been found. And Frank Norris testified that whatever the judge told him to do, he would do. Now this issue of dangerousness. What would be the reasonable alternatives in this case? You know, I think that Judge Ruth had, you know, well, she gave several examples. One example is you could arrange it so that the shackles aren't visible. That's one possibility. And, yes, it would be some inconvenience and it would take some time. Maybe the veneer would have to be escorted out of the room and Mr. Calhoun would have to be brought into the room. And then he would be seated without his shackles being visible and the jurors would come back. That would be a possibility. But the outcome of that motion would have been, that was not a frivolous motion as the government has argued. That was not, when Mr. Cannon says, I knew Judge Katz would never permit this to happen, he was speaking not out of his experience but out of his ignorance of the law. He testified at the evidentiary hearing. How come Mr. Calhoun didn't testify at the evidentiary hearing? Really, Judge, having put on the evidentiary hearing myself, I believed it was sufficient that Mr. Cannon testified that he, that the government stipulated that no objection was made. So what we're left with is a vague or somewhat muddied recollection of Mr. Cannon as to what went on. Well, yes, that's true. But what he testified was that he knew that he did not make such a motion and that he would not have made such a motion and that his reason for not making such a motion was not strategic because one of the issues that the judge found was that he did not preserve this issue for appeal and it would have been a very good appeal issue. Let's come back to the second problem because it seems, as I recall, every court of appeals that's ever considered this issue has found that shackling, even if it is violative of the first prong of Strickland, is overcome by overwhelming evidence. It can be overcome by overwhelming evidence. And Mrs. Osmers and I noted to you a lot of evidence that existed at trial against Mr. Calhoun. There is strong evidence on the possession count. And, you know, I've said in my brief there's a big difference between the evidence on the possession count and the evidence on the conspiracy count. I do not think the evidence on the conspiracy count raises to the level to overcome the prejudice that's here. And, you know, I will say this also about the five kilos. The testimony certainly cuts against you on the conspiracy count, doesn't it? Mr. Esteva's testimony is that Mr. Calhoun is a customer and he says that he's bought five kilos. That's the testimony. That's what the agent's testimony is. That's absolutely enough to get you past Rule 29. But I don't think that without seeing Mr. Calhoun in shackles as a first impression in this case, I don't think it's proof beyond a reasonable doubt. It's an agent and a cooperator. Those are eminently impeachable sources. There's not five kilos sitting on the table. There's a little more than one kilo in the possession count. And it's the five kilos. It's the five kilos that's the prejudice here. So you really have to separate where's the strong evidence. The strong evidence is on the possession count. The strong evidence is not on the conspiracy count. There's a very good argument that Mr. Calhoun is a customer, not a co-conspirator. And I think this is really why the shackling matters. I mean, we talk about what is the basis for having a conspiracy count. We charge conspiracy because when people get together, that's dangerous. That's what the cases say. Combinations are dangerous. And it's the shackling that makes him look dangerous. I do not think that the fact that the shackling – Would you feel Mr. Calhoun attempt to at some point cooperate with the DEA, which in effect would put him in place as a co-conspirator, would it not? I don't think so. I don't think necessarily. If you are a buyer – How do you think Mr. Calhoun purported co-conspirators in his discussions with the DEA? I don't believe that's – I'm not sure if that's in the record, Your Honor. What he did do for the DEA was he set up another buy. That's what he did. He set up another purchase. He was a customer of Esteves. Being a customer and having tequila with you is a whole lot of cocaine. It's a lot of cocaine. And it's very strong on the possession count, Your Honor. But it doesn't make you a co-conspirator, and there are cases in this circuit that say so very clearly. And I understand that the evidence was sufficient, as I said, to sustain the conviction. But I don't think the evidence was sufficient to overcome the prejudice here. Thank you very much. Mr. Osborne. Just a couple quick points, Your Honor. I think it's very telling that my friend, Ms. Brotman, who we all know is just such a talented lawyer, after all this preparation, when she's asked the question, what is the reasonable alternative, she pauses and what she ultimately says is, take everybody out of the room. Take 200 people and tell them, go out if you fit into that hallway out there while we set something up here. That, of course, tells the jurors exactly the same thing, which is that something's going on with this defendant. There was no reasonable alternative. Cannon knew that. The marshal makes it clear, had he made the objection, the same hearing that took place here would have taken place then. And he says what the result would have been, they haven't carried their burden to show otherwise. With regard to the prejudice prong, let's talk about the evidence here on the conspiracy count real briefly. Calhoun admitted when he was arrested, and this is in the record, he admitted that he had been purchasing a kilo a month from Estevez since July, six months earlier. That's what gets you over the five kilos. What Ms. Brotman says is that's just indications that he was a purchaser or buyer. That's true, but when you look at the factors under this court's decision in U.S. v. Gibbs, every factor that makes a customer into a conspirator as well was present. Long-term involvement, large transactions, a settled method of doing business. Calhoun not only knew Estevez, but he knew Risquet, who was Estevez's supplier. They recognized each other. They would get together. This was not an ordinary buyer-seller relationship. Buyer-seller relationship is somebody makes the goods, ships them to Macy's, I go to Macy's and buy my shirt or whatever it is. Here, everybody's getting together. Estevez is the middleman who's bringing Risquet and Calhoun repeatedly together, and Estevez is getting a $1,000 cut. That's a conspiracy, and this court has held that over and over again. In addition, the one thing, really the last thing you need to say about it, is that part of it was on credit. This court held in Iglesias that credit alone establishes a conspiracy in a buyer-seller relationship. And this was monitored. This isn't anybody's word. Calhoun said, I still owe Estevez $1,300 for that kilogram that you found in the bag in my hand. And so they monitor him. They give him the $1,300. It's government money. And they monitor him as he goes back and pays it to Estevez and confirms that. And then they record as Calhoun sets up the exact same deal with Risquet and Estevez that he says has happened at least six times before. This is overwhelming evidence. This is irrefutable. It's based on his own words. It's based on the agent's observations as well as on the admissions of everybody involved. And that's why I said this is such a strong case for prejudice. The last thing I'll say, Your Honor, is prejudice is not just measured here by what the evidence was, but that a trial took place. The jurors may have seen him briefly in shackles, but then they saw a trial that was conducted consistent with all constitutional requirements in which Mr. Calhoun was not shackled, in which he did not have that imprimatur of being dangerous, in which the judge told them to only consider the evidence and only consider the facts. Was it confirmed that any of the jurors saw in the veneer Mr. Calhoun being shackled? We have just accepted that. No jurors were called. There was no evidence. But we agree that when he's brought into a room like this with so many people, someone's going to see it and likely be one of the people who wind up on the veneer. Generally, you have about 100 to 200 people in this room, the evidence was. Forty of them are generally taken to a courtroom to allow the selection of 12 plus the two alternates. We're not disputing that somebody saw him in shackles. So if we were to agree with you on the prejudice prong, we don't have to go into the first prong? That's correct. And the Supreme Court explicitly says that. Exactly. And if we were to think that Ms. Brotman was correct, that we might want the district judges to be reinforced in the idea that with shackles they should make specific findings, we would stay away from the first prong as well. That's right, because that would go to the first prong. We have no objection to district courts being reminded of that. That is the law. There should be specific findings. The issue here is would those findings have led to any different results? And the answer is no. Thank you very much. Thank you, sir. Thank you to both counsel for well-presented arguments. And we'll take the matter under advisement.